SPRAGUE ELECTRIC RAILWAY & MOTOR CO. v. NASSAU ELECTRIC
R. CO.

(Circuit Court, E. D. New York. November 10, 1899.)

PATENTS—INFRINGEMENT—ELECTRIC RAILWAY MOTORS.

The Sprague patent, No. 324,892, for an improved electric railway motor, describes an invention for carrying the motor frame suspended beneath the vehicle centered on the axle at one end, and supported at the other by a flexible connection with the truck frame or body of the car, its principal feature being to provide a flexible connection between the motor frame and truck frame or car body, so that the position of the motor will not be affected by the movement of the truck on its springs. Claims 2 and 6 construed, and *held* infringed.

This was a suit in equity for infringement of a patent. On final hearing.

Frederick H. Betts and L. F. H. Betts, for complainant.

George J. Harding, William H. Kenyon, and Frank S. Busser, for defendant.

THOMAS, District Judge. Letters patent No. 324,892, issued to F. J. Sprague on August 25, 1885, relate to the suspension of an electric motor under a car propelled by it. The patent, although not in issue, was considered by the circuit court of appeals for the Eighth circuit in a suit between the Adams Electric Railway Co. and the Lindell Railway Co., 23 C. C. A. 223, 77 Fed. 432, 452. It was directly involved in Sprague Electric Railway & Motor Co. v. Union Ry. Co. (C. C.) 84 Fed. 641, decided by Judge Wheeler, whose decree was affirmed by the circuit court of appeals for the Second circuit (31 C. C. A. 391, 88 Fed. 82); which litigations did not bring to notice the precise feature of the patent alleged to be infringed in the suit at bar. A preliminary injunction was granted by Judge Lacombe in the present action, and the circuit court of appeals for the Second circuit, in another action between the same parties, upon an appeal from an order granting a preliminary injunction (C. C. A.; 95 Fed. 821), passed upon the patent. Upon these various occasions the validity of the patent has been sustained, but the reason at present urged for noninfringement was not suggested by the defendant until the present argument on the merits. In the Union Railway Case, Judge Shipman plainly describes the Sprague mechanism. He says:

"Sprague hung the motor under the car body directly upon the axle of one of the pairs of wheels by an extension or solid bearing attached directly to the motor. He used a magnet having a yoke and pole pieces, and by sleeving one end upon the axle he caused the armature, which was carried between the poles of the magnet, to be held with firmness, and the armature shaft to be held in alignment with the car axle. The opposite end of the motor was upheld by springs extending to a crossbar on the truck frame. He also relieved the weight upon the axle by a spring support from the truck of the vehicle. The motor was thus hung below the car, one end being centered upon the axle, and the other end being flexibly attached by springs to the truck frame. The effect of the mode of construction is explained in the specification as follows: 'The armature being carried rigidly by the field magnet, these two parts must always maintain precisely the same relative position under every vertical or lateral movement of the wheels or of the car body; and as the field magnet which carries the armature is itself centered by the axle of the wheels to which the armature shaft is geared, the engaging gears also must always maintain precisely the same relative position. At the same time the connection of the entire motor with the truck is through springs, so that its position is not affected by the movements of the truck on its springs.'"

The complainant's device, and the useful result to be attained therefrom, having been stated, the claims alleged to be infringed may be considered. Such claims are Nos. 2, 4, and 6. They are as follows:

"(2) The combination of a wheeled vehicle and an electro-dynamic motor mounted upon and propelling the same, the field magnet of said motor being sleeved upon an axle of the vehicle at one end, and supported by flexible connections from the body of the vehicle at the other end, substantially as set forth."

"(4) The combination of a wheeled vehicle, an electro-dynamic motor mounted upon and propelling the same, the field magnet of said motor being sleeved upon an axle of the vehicle, and the armature of said motor being supported upon the field magnet, and gearing between the armature shaft and the driving wheels of the vehicle, substantially as set forth."

"(6) The combination, with a wheeled vehicle, supported upon its axles by springs, of an electro-dynamic motor flexibly supported from such vehicle, and centered upon the driving axle thereof, substantially as set forth."

The issue in this case relates solely to the support of the off or nose end of the motor. It will be noted that by claim 2 such end is "supported by flexible connections from the body of the vehicle." Claim 4 makes no allusion to the support of such end of the motor, while claim 6 provides for a motor "flexibly supported from such vehicle"; and such vehicle, in the same claim, is stated to be "a wheeled vehicle, supported upon its axles by springs." Upon the hearing respecting the preliminary injunction (C. C. A.; 95 Fed. 821) the circuit court of appeals stated:

"Unless the defendant's motor is 'supported by flexible connections from the body of the vehicle' at the end opposite the driving axle. it does not infringe the second claim: and, unless it is 'flexibly supported from such vehicle,' it does not infringe the sixth claim."

The court further states:

"The Sprague invention was not a pioneer, and was not of a broad character, but it was a distinct and clearly-defined invention in the method of hanging electric motors for vehicles, and its gist consisted in the utilization of the frame of the motor itself with the necessary extension, and the centering of the motor on the driven axle by extension pieces from the field magnet at one end, and in its flexible suspension at the other end to the car truck, the armature being carried rigidly by the field magnet."

The court further says:

"The prior patent to Finney discloses the principal features of Sprague's invention, and what Sprague has described and claimed in the present patents are improvements in details of construction and arrangement. One of his improvements consists in introducing a flexible connection between the motor and the car body, or the truck frame, at the end opposite the driving axle. In the motor of the Finney patent that end rests upon the crossbar of a frame which is supported by the axles of the vehicle. It is rigidly connected with the crossbar, and the crossbar is bolted to the frame. In the present patent that end of the motor is 'hung from a crosspiece, F, on the truck, by heavy springs, b, b, or from the car body itself in the case of a street car or other vehicle having no truck.' Another improvement described in the patent consists in introducing supporting springs at the axle end of the motor. 'These springs extend to crossbars on truck frame, or to the car body in case no truck is used. Their tension is adjusted by nuts, t, which are locked by other nuts, u. This adjustment may be such as to carry wholly or partially the weight of this end of the motor, or so as to actually exert a pressure upon the lower side of the driving axle.' The improvements described are apparently contrived to hold the motor in elastic restraint. The specification states that 'the connection of the entire motor with the truck is through springs. so that its position is not affected by the movements of the truck upon its springs.' "

It is considered that this quotation suggests the salient features of the Sprague patent, and that the last sentence thereof embodies a full statement of the mischief which Sprague intended to avert, and his means of averting it. The disturbing element was the movement of the body or truck on the springs, and the consequences

therefrom to the motor were to be avoided by flexibly attaching the motor to the body or such truck. In all the opinions which have been written in this circuit concerning the Sprague patent, the relation of the motor to the body of the car, or to the truck of the car, has been considered with reference to the twisting or turning of the body of the car upon its springs; and no other thought seems to have been in the mind of the inventor, save as shall be hereinafter stated. It is thought that Sprague had no conception whatever of preventing any movement which could be communicated to the motor, provided the motor were so placed that it was totally unaffected by the motion of the body of the car upon its springs. This view is strengthened by the language of the specification, which states:

"My invention relates to electric motors mounted upon railway cars for the purpose of propelling the same, and my object is to so arrange and support the motor that the relative positions of the armature and field magnet of the motor will not be changed, and the mechanical connections between the armature and the driving axle will not be disturbed by any movement of the car body on its springs at the same time that the driving axle will be relieved of dead weight."

This is the introductory sentence of the specification, and presents the vital thought in the mind of the patentee. The specification further states:

"The truck body is supported from the axles, C, C', through springs, in any usual manner."

This indicates that the truck in the inventor's conception was one resting on springs, and thereby supported from the axles. Again:

"The yoke or back piece, a, of the field magnet, is hung from a crosspiece, F, of the truck, by heavy springs, b, b, or from the car body itself in case of a street car or other vehicle having no truck." Again: "The armature being carried rigidly by the field magnet, these two parts must always maintain precisely the same relative position under every vertical or lateral movement of the wheels or of the car body."

Here is a single reference to a "vertical or lateral movement of the wheels," but it is made in connection with a description of the fastening of the motor to the driving axle, for the patentee states, in the next sentence:

"At the same time the connection of the entire motor with the truck is through springs, so that its position is not affected by the movements of the truck on its springs."

The movement of the body of the car or of the truck on its springs is constantly manifest, and is the ever-present thought. True to this thought, the inventor has in no way suggested the attachment of the off end of the motor to any part of the car totally unaffected by the movement of the car body or car truck upon its springs. Claim 2 in terms describes a motor "supported by flexible connections from the body of the vehicle at the other end." The language of claim 6 is no broader in this regard:

"The combination, with a wheeled vehicle, supported upon its axles by springs, of an electro-dynamic motor flexibly supported from such vehicle, and centered upon the driving axle thereof, substantially as set forth."

The question now arises whether, in view of all that has gone be fore, the word "vehicle" means the entire car, or whether it refers to the body of the car. The very language used in the claim indi cates that the patentee used the word "vehicle" in the sense of the body of the vehicle, for he refers to a "wheeled vehicle, supported upon its axles by springs." If the word "vehicle" referred to the whole car, then it would mean that the whole car must be supported upon its own axles by springs; which would call for a vehicle as a unit, supported upon one of its component parts. Such construc tion not only would involve an absurdity, but also would be incon sistent with the other parts of the specification. Again, in claim 9 provision is made for "a spring support for the other end of motor from the truck or body of a vehicle, substantially as set forth." To what does "substantially as set forth" refer? If the reference be to the descriptive part of the specification, there will be found only a conception of some attachment to the truck or body of the vehicle; if reference be to the figures, such conception, and nothing else, will be found.

It remains to be considered whether the defendant's structure in fringes the patent under the construction above put upon it. In order that no injustice may be done the defendant in portraying its structure, the only description thereof contained in the defend ant's brief is here given:

"The car and motor support employed by defendant is in its essential char acter a wholly new creation. It is true that the longitudinal plates marked A, A, in the exhibit, are practically identical in location and function with the truck frame. A, of the Sprague patent; that is, they are mounted upon the car springs, and the car body is attached thereto either directly in the case of a single-truck car, or pivotally in the case of a double-truck car, such as is shown in the Sprague patent. It may be admitted that this part, A, A, of respondent's structure is the substantial equivalent of the truck frames de scribed in the patent in suit, as it is mounted upon the car springs, B, B, in just the same way as the truck frame of Sprague. The whole structure, how ever, between the axle boxes, 11, and the car springs, B, B, is peculiar to the modern art, and constitutes the special motor frame or motor truck frame or motor frame of the truck, whose primary purpose is to support the motor The motor frame, comprising mainly the equalizing bars or axle bars, C, and crossbars, E, E, and D, D, is practically rigid with the axle boxes. The equal izing bars, C. are four in number, two on each side of the axles, and arranged on edge, with castings to stiffen them, and rivets uniting the members of each pair and the stiffening castings. The equalizing bars are carried by very stiff journal springs, normally inactive, whose sole function is to prevent shocks to the vehicle when the wheel strikes a high or low place in the track by per mitting the motor frame to give slightly in a vertical direction. Heavy brackets, G, are provided, which are secured firmly to the motor frame, so as to engage as closely as possible the sides of the axle boxes, H, thus pre venting any longitudinal movement of the frame. It is upon this rigid motor frame that the off end of the motor is carried."

Some addition to this description is necessary for the purposes of greater accuracy. A rod passes through the end of each journal spring and the so-called "motor frame," and, as the end of the journal spring lies in a guide or loop extending from the truck frame, both the truck frame and motor frame are so connected by such rods that any upward lift or strain upon the former is brought to bear upon the latter. This establishes a direct relation between the two frames

It is already conceded by the defendant's description of its structure that the motor frame is so adjusted as to allow it a vertical motion. The result is that in theory a downward movement of the truck frame is communicated to the motor frame, and a vertical motion thereof results. If such motion exists, there is no reason why the same should not be communicated to the crossbar to which the motor is attached; and, to avoid the same, what are called by the defendant "cushioning springs" are placed at each end of the crossbar. It is claimed by the defendant that in practice the springs are so adjusted that the vertical movement is very slight, and that it could not be carried injuriously through the crossbar to the motor. However that may be, there is a mechanical connection between the truck frame and the motor frame, whereby the former rides upon the latter, with the possible result of giving it motion. If such motion be not communicated to the motor frame, it is because of some special arrangement of parts tending to prevent the same. Primarily, the two frames are so related that one influences the other; and it is considered that the relation is sufficient to bring the defendant's structure within the terms of the complainant's claim. This conclusion accords with the several former decisions involving the defendant's structure, or similar structures, whose authority this court should observe.

It results from the foregoing views that complainant should have a decree enjoining the defendant from infringing claims 2 and 6. Claim 4 involves no greater rights.