### UNIVERSAL RIM CO. v. FIRESTONE STEEL PRODUCTS CO. et al.

(District Court, N. D. Ohio, E. D. March 29, 1923.)

No. 757.

1. **Patents ☞328—1,095,775, claims 1, 9, for demountable tire-carrying rims, held invalid for anticipation and want of invention.**

The Baker patent, No. 1,095,775, claims 1 and 9, for an improvement in demountable tire-carrying rims, transversely cut at one point and positively though detachably, connected by a plate, *held* invalid, because anticipated, and because they disclosed no invention over the prior art.

2. **Patents ☞65—Obvious mechanical changes in foreign patented device do not defeat anticipation.**

The rule that foreign anticipating patents must exhibit the patented invention in such full, clear and exact forms as will enable any person skilled in the art to practice the invention without making experiments, does not exclude the right to make such obvious mechanical changes or refinements in the anticipating structure as are usual and permissible in adapting the invention to commercial and practical use.

3. **Patents ☞73—Evidence held not to show invention earlier than application date.**

In a suit for infringement of a patent, oral evidence *held* insufficient to sustain the heavy burden placed on plaintiff to show invention earlier than his application date, so as to avoid anticipation by a foreign patent issued prior to his application.

4. **Patents ☞328—1,095,775, claims 2, 6, for demountable tire-carrying rims held not infringed.**

The Baker patent No. 1,095,775 claims 2 and 6, for improvement in a demountable tire-carrying rim, the characteristic element of which was the form of the plate connecting the rim at the transverse cut, so as to serve also as a driving connector, *held* not infringed, when limited, as they must be, in view of the prior art, to the precise form described.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Patents ⬚165—Each inventor taking step in gradual advance can claim only his specific form.**

> If the advance toward the desired thing is gradual, and proceeds step by step, so that no one can claim the complete whole; each inventor is entitled to the specific form of the device he produces, and every other inventor is entitled to his own specific form, so long as it differs from those of his competitors, and does not include theirs.

In Equity. Suit for infringement of patent by the Universal Rim Company against the Firestone Steel Products Company and another. Decree entered dismissing the bill.

Henderson, Quail, Siddall & Morgan, of Cleveland, Ohio (Arthur Wm. Nelson, of Chicago, Ill., of counsel), for plaintiff.

Rector, Hibben, Davis & MacCauley, of Chicago, Ill., for defendant Firestone Steel Products Co.

Edward Rector, of Chicago, Ill., and Albert L. Ely, of Akron, Ohio (F. O. Richey, of Cleveland, Ohio, of counsel), for other defendants.

WESTENHAVER, District Judge. This is the usual patent infringement suit, with the usual defenses of invalidity and noninfringement. It is based on United States letters patent No. 1,095,775, issued to plaintiff as assignee of Erle K. Baker, May 5, 1914, on application filed June 13, 1910. Claims 1, 2, 6, and 9 only are in issue. The patented device purports to be for an improvement in demountable tire-carrying rims, of the kind which are somewhat larger than the automobile wheels on which they are designed to be used, and which are secured to the wheels by means of clamps or wedge lugs. Demountable rims of this kind are referred to in the patent and in this record as of the bolted-on type, because the clamps or wedge lugs are secured to the wheel and operated by transverse bolts in the wheel felly. Baker in his patent states that prior to his invention it had been necessary to make bolted-on rims of this type in the form of endless rings to withstand the expanding strains of the wedge lugs; also that it has been customary to provide these endless rings with endless integral flanges, if intended for use with tires having stretchable base beads and with a detachable flange for the outer edge, if intended for use with tires having nonstretchable base beads; that is, beads having a core of metal or wire cable. This last type, with detachable flanges, he says, is objectionable because of its excessive weight, slowness in application, danger of blowing off, and expense of making and assembling. Defendants deny that this is an accurate statement of the then state of the art.

The patent states that the object of the invention is to provide a one-piece demountable rim of the bolted-on type, which shall have integral tire-retaining flanges, and shall nevertheless be adapted for use with tires of all descriptions, including tires having nonextensible base beads. His invention, as broadly stated in the patent, is "an integrally flanged demountable rim of the class described, which is transversely split or open at one point in its circumference, in combination with a metal plate extending across the split in the rim, and positively, though de-

---

⬚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tachably, connecting the ends of the rim, whereby two principal things are accomplished, to wit: The rim, while the plate connects its ends, forms a practically continuous or endless ring, well adapted to withstand the expanding strains of the clamping devices upon the wheel; and when the ends of the rim are disconnected, the rim readily may be contracted and either placed in or removed from the tire." Claims 1 and 9 claim broadly and generally the invention thus described, and the controversy herein revolves around the broad invention thereby claimed. The patent further states that the invention "consists in various novel details of construction and in combination of parts, all as hereinafter described and particularly pointed out in the claims." Claims 2 and 6 claim specifically one embodiment of this specific form.

In this opinion I shall deal first with the alleged general broad invention and the broad claims 1 and 9, and defer the specific invention and claims 2 and 6 for later discussion. Claim 1 is in these words:

"A one-piece integrally flanged demountable rim of the bolted-on class described, and transversely split at one point only in its circumference, in combination with a plate extending across said split and positively and nonadjustably, but detachably, connecting the ends of the rim for the purposes specified."

Claim 9 differs from claim 1 only in that the transverse split presents "straight cut noninterlocking opposed rim ends and means on said ends." In substance there is no real difference between them.

The testimony has taken a wide range. The prior art, both foreign and domestic, has been produced in great volume. Physical embodiments of numerous types of split and demountable rims have been produced and exhibited. In an industry so new and extensive, and so rapidly developed, this art is practically limitless, and in this opinion I shall deal only with that which I regard as the most pertinent. Likewise the argument upon the law has covered all the principles relating to invention, anticipation, priority of use, weight to be given to commercial success, and trade acceptance. No difference of opinion exists as to the law, the principles of which are settled by the numerous decisions cited and are familiar to all members of the patent bar. I do not deem it necessary therefore to restate these principles at any length, nor to review the authorities, but shall preferably limit my references to cases arising in this circuit, which were heard by me and reviewed on appeal, and which involve the principles of law applicable to the various aspects of this controversy. It is sufficient to say that all pertinent and applicable rules of law have been given due consideration; but, as is usual in patent cases, where the defense is invalidity because of anticipation or for lack of novelty, the issue in its last analysis becomes one of fact, and must be determined by a balancing of considerations making for or against the question of validity.

[1] It is asserted that all the features and elements of the Baker patent embodied in claims 1 and 9 are not only old in the art, but old in this precise combination. They further contend that, even if these old elements are not embodied in any one specific combination, no invention was required to combine them into a structure in the manner set forth in the patent. Plaintiff concedes that the elements are old, but contends that the combination as made is a new and true combina-

tion, and therefore embodies invention. On this hearing the question of whether or not invention is present finally resolves itself into the element or feature of a plate extending across the transverse split and positively, but detachably, connecting the ends of the rim. In my opinion, the novelty, if any there is, in claims 1 and 9, turns upon this consideration, and, if novelty exists, then the validity turns on whether the selection and adaptation from the prior art of a plate for use in this manner amounts to invention.

These contentions necessarily involve a more or less detailed examination of the prior art. The principal point of departure for this examination begins with certain French patents. This is true, because the automobile was developed and first brought to a state of practical efficiency and perfection in France; indeed, prior to the date of Baker's alleged invention, it is not too much to say that practically all new devices in automobile construction were of foreign origin, particularly of French origin, and that, like women's fashions, the knowledge and acceptance thereof came to the United States a year or two later. The patents first to be considered relate to detachable and demountable tire-carrying rims and to the clamping or wedge lug devices whereby they are secured to the wheel.

On November 4, 1904, in France, and on October 30, 1905, in England, Gaston Vinet obtained a patent for a detachable and demountable tire-carrying rim of the bolted-on type. His method of mounting has been known ever since its first introduction here as the continental type. Pneumatic tires, he states in his patent, are subject to puncture and in consequence require frequent repairing, the expenditure of much time, and, in addition, give the owner much inconvenience and trouble. To obviate these disadvantages, he says it has been proposed to carry spare interchangeable rims fitted with tires already inflated, so that, when the tire in place becomes damaged, it is only necessary to remove the rim, and therefore the tire with it, and substitute another rim with its tire. His invention calls for an interchangeable rim having conical sides, a wheel felly having a corresponding conical inner side, and a wedge ring of similar conical shape on the outer side, clamped or bolted into position. The method of mounting is standard to this day. It is the method illustrated and described in the patent in suit and other patents obtained by Baker, except that wedge lugs, the admitted equivalent of a wedge ring, are used in place of the continuous ring. It also has been and is generally used by all American makers of detachable and demountable tire-carrying rims, with the exception of the Kelsey Wheel Company, which has generally used what is known as the Michelin method of mounting.

Criticism of Vinet's disclosure is limited to the alleged fact that his rim fits snugly the wheel felly and leaves no intervening space or gap between the two, as appears in Baker, and as is referred to in his patent specifications. The importance attached to this intervening space is that it facilitates what is called the "buttoning on" process in applying a detachable or demountable rim. The prior art, however, shows many instances of Vinet's method of mounting with this intervening space. United States letters patent No. 934,187, issued to C. Kind-

scherf September 14, 1909, on application filed June 30, 1908, discloses a wedge lug with Vinet's mounting of the bolted-on type, with an intervening space between the rim and the felly. United States letters patent No. 956,611, issued to W. Tischbein May 3, 1910, on application filed July 29, 1908, also shows a similar intervening space with the Vinet method of mounting and wedge lugs of the type of the patent in suit, and also, what is of importance in connection with claims 2 and 6, driving connections between the rim and the felly. United States letters patent No. 927,266, issued July 6, 1909, on application filed July 31, 1907, to A. J. Michelin, likewise shows this intervening space, with a method of mounting the tire-carrying rim somewhat different from Vinet, and in which clamps, instead of wedge lugs, are used. This method of mounting, known as the Michelin method, was promptly adopted and has ever since been widely known and used in the United States, particularly and at present, by the Kelsey Wheel Company. Figs. 5 and 6 show variations of the Michelin method of mounting which are found in some of the Baker patents of a later date, introduced in evidence on this hearing.

So far, therefore, as Baker's invention depends in any wise on the manner of mounting the wheel on the rim; so far as any benefit or advantage results from making the demountable rim enough larger than the felly, so as to facilitate the buttoning-on process; so far as it embodies beveled or conical integral flanges on the demountable rim and the corresponding flange on the inner sides of the wheel felly; so far as wedge lugs securing the felly by a transverse bolt are used to adjust and hold the rim in place—it conclusively appears that Baker is fully anticipated. To this extent he did nothing more than adopt and use the well-known and standard practice of the industry, taught and disclosed in numerous prior patents. No different problem is presented in mounting a transversely split rim upon a wheel from that involved in mounting a nonsplit or continuous rim, since, once a tire is placed on the transplit rim and inflated and the ends brought into apposition, it likewise becomes thereafter a continuous rim, and must be mounted and demounted in precisely the same manner. No' invention can possibly be involved in applying methods of mounting, developed and used with one type of rim, to the other type.

Transsplit rims were also old in the patent art prior to Baker. My consideration of the art in this case, as well as the tire-making art in this and other cases, convinces me that the rim makers followed and did not lead the tire maker. The vexing problems in the early days, if not now, were in the domain of the pneumatic tire, rather than in the tire-carrying rim or the methods of mounting the rim on the wheel. The substitution of a pneumatic tire with nonstretchable or inextensible base beads, due to the insertion therein of a metal core or wire cable, for a pneumatic tire with flexible and stretchable base beads, produced undoubtedly a new problem in the mounting of the tire on the rim. An early, if not the earliest, form of a tire with nonextensible base beads was the Dunlop tire, which is not now widely used although the evidence shows it is still made and sold. In the Dunlop tire, the shoulders adapted to be gripped or clenched by the integral flanges of the tire-

carrying rim were, if not absent, not well developed, and subsequent steps in the tire-making industry produced beads with bulging and well-marked shoulders, better adapted to be gripped or clenched by the rim flanges. Thus a new situation, if not a new problem, was presented to the rim makers for the exercise of their mechanical skill, and perhaps of the faculty of invention. In the art now to be reviewed, it will be seen how the industry step by step met these new demands. An early device still in common use is what is known as the Q. D. detachable; but, as it is not involved in this case, detailed comment and description is unnecessary. It is well illustrated in Defendants' Exhibit No. 2, Firestone Catalogue, Quick Detachable and Demountable Rims, p. 8. While more expensive to make and requiring greater material and weight, it is the standard equipment of the high-priced and better grade of cars, like the Pierce-Arrow and Packard.

Our consideration of the prior art will be limited to the specific type of transsplit rims in which the diameter of the rim may be reduced by overlapping or lateral diversion to permit a tire with nonextensible beads to be put on or removed. As already said, the transsplit rim for this purpose is old in the art. In this case, discussion of the foreign patent art revolved chiefly around French letters patent No. 404,452, dated October 20, 1909, issued to Gustave Bouquillon, and French letters patent No. 400,394, issued June 4, 1909, to Henry Rougier. Defendants contend that these patents, particularly Bouquillon, are a complete anticipation of Baker. Plaintiff has, in reply, offered evidence tending to show priority in Baker; but, for reasons later to be stated, my finding is that priority is with Bouquillon and Rougier.

Before examining these respective contentions, certain American patents are worthy of comment, particularly United States letters patent No. 915,954, issued to C. G. Hawley and E. K. Baker March 23, 1909, on application filed April 11, 1908, No. 1,095,916, issued to Charles Gilbert Hawley and E. K. Baker, May 15, 1914, on application filed June 14, 1909, and No. 1,095,771, issued to J. A. Anglada May 5, 1914, on application filed June 4, 1910. The Baker of these patents is the same as the Baker of the patent in suit. The Hawley is and always has been president of the plaintiff company, and is the attorney who solicited these patents, as well as the patent in suit. They are not pleaded and relied on as an anticipation, and, with the exception of the earliest number, are not a part of the prior art, because, even though applied for earlier, were not issued and published until the same date as the patent in suit. They are, however, important as evidencing that the transversely split rim was old in the art, well known in the rim industry, and common property at the application date of the patent in suit and for several years prior thereto in the United States. They are therefore not without weight in passing on a question of invention, because of the light they throw on the then state of knowledge in the rim-making industry.

Anglada shows all the elements of claims 1 and 9 in the same combination, except the plate connecting the rim ends across the transverse split. It shows a tire-carrying rim with integral flanges transversely split at one place only, with means for uniting and aligning the ends

of said rim. These means are called "aligning and uniting lugs," located on the felly band and engaging pins on either side of the transverse split, and adapted to bring the ends into alignment and lock them positively, but detachably, together. The result obtained is the same as that claimed for Baker's connecting plate, although the principle of operation is different. Hawley and Baker patent, No. 1,095,996, shows also an integrally flanged demountable rim transversely split at only one place, and, as I interpret the drawings and specifications it is difficult to perceive why it does not fully disclose all of the elements of claims 1 and 9 in issue. It is true no plate of the same form is shown extending across said split, but it discloses locking means on the side flanges thereof adapted to hold the rim ends against circumferential expansion, and might well be regarded as the mechanical equivalent. This is particularly true, since plaintiff's contention is that claims 1 and 9 cover all integrally flanged transversely split rims having rim ends nonadjustably, but detachably, connected by a plate or a member which bridges the split. See Defendants' Exhibit 35, Ready Reference Code of Patent Markings of Plaintiff Company, No. 28, sheet 4. Hawley and Baker patent, No. 915,954, discloses only a demountable or detachable rim transversely split at only one place.

The Bouquillon patent discloses in combination an integrally flanged tire-carrying rim mounted on an automobile wheel, with the familiar Vinet or continental method of mounting and transversely split at only one place. The drawings do not show a plate across the split connecting the ends of the rim, but the specifications say that, after the two ends are joined, they "may be held end to end by any suitable means," and the prior art to which he thus refers, discloses numerous suitable means, one of which is precisely like Baker's and had already been adopted and used for that purpose. Bouquillon does not disclose driving connections between the rim and the felly band, nor located upon the connecting plate, as called for by claims 2 and 6 of the Baker patent. The omission of driving connections from the combination is not material in passing on the validity of claims 1 and 9, because driving connections are not included in the combination thereby claimed; but here again the prior art, as already stated, shows that driving connections were old and in general use. Moreover, in my opinion, neither the conception itself of driving connections to prevent circumferential creeping of the rim upon the wheel, nor the designing of suitable means for embodying that conception, presents any problem of invention. Any head foreman of any shop, when informed of this tendency to creep, would naturally and promptly conceive the means and devise a form necessary to overcome it. Any village blacksmith, who had ever mounted an iron tire upon a wagon wheel, would, in my opinion, possess sufficient skill to solve this problem.

Such being the disclosures and teachings of the Bouquillon patent, it seems to me that it is a complete anticipation of claims 1 and 9. That it is not an anticipation depends on the validity of the criticisms made of it by plaintiff, namely, that the shape and form of the tire-carrying rim is different, and is suitable only to carry a straight-side Dunlop type of tire, and that circumferential expansion, after the

split ends were in apposition, was still contemplated to hold the rim against the rods in the tire beads. This last criticism, it is urged, proves that Bouquillon contemplated a different principle of operation. In my opinion, these criticisms are not sound. The rim was undoubtedly specially adapted for use with the Dunlop type of tire, but the changes required to adapt the rim to any type of tire involve only slight modifications of form, and no new principle or function, and were obvious and within the skill of any mechanic upon a casual view of a different type of tire. The change of form was only the perfecting and refining usually necessary and always permissible in developing commercially an invention.

Nor did Bouquillon contemplate or teach that further circumferential expansion was necessary or required for the proper functioning and operation of his combination after the split ends were brought end to end. On the contrary, saving the necessary manufacturing tolerances, he taught that, when the ends were thus brought in apposition, this would be the greatest diameter of the rim and the entire expansion, and that, when connected together in that position by any suitable means, would perform the function claimed. The specifications expressly disclose that the removable rim is an open ring, integrally flanged; that its ends are capable, by contraction, of overlapping, so as to reduce the rim diameter; that the purpose of thus splitting and contracting it is to admit of its easy placing within the tire, which is only another way of saying, as does Baker, that the tire may then be easily mounted on the rim; that after the rim is placed within the tire, or the tire mounted on the rim, the removable rim may be expanded, so as to join together its two ends; that the two ends may then be held together by any suitable means; that the removable rim with its tire and inner tube may be mounted on the wheel in any known manner. The specifications also refer to the tire beads as nonextensible, expressly declare that, when the rim ends are brought together, then the rim has reached its largest diameter, and is positively held extended at that diameter. Such are the disclosures of Bouquillon, and it seems to me that, although expressed in different words, they are the precise combination of claims 1 and 9.

It is urged that Bouquillon was of opinion that a rim thus constructed would function independently of the air pressure of the tire, and this is true; but this I regard as immaterial, especially as no means were provided or suggested by Bouquillon for eliminating the effect of that pressure. However, that Bouquillon was right in assuming that, when the rim was thus expanded to its largest diameter, he had fully solved the problem, is apparent from the other evidence in the record. In 1917 the Kelsey Wheel Company began making split demountable rims without any plate across the split connecting its ends. It has since made and sold this type by the millions, and they ever since have been and are being used upon standard makes of medium and low priced automobiles. The expanding effect of the wedge lugs against the inward pressure of the inflated tire is in practice almost negligible, and does not seem to have impaired the efficiency or popularity of the Kelsey rim. It is possible, as was experimentally demon-

strated on this hearing, to expand the tire further by excessive tightening of the wedge lugs and to distort the gap unevenly; but the testimony of Mr. Booth, as well as the enormous production and sale and use of the rim thus constructed, convinces me that normally the expansion does not exceed greatly the three-sixteenths inch tolerance allowed by standard manufacturing practice. Indeed, it is questionable whether such expansion exceeds the play or lost motion between the rim ends and plate of Baker's device in its first commercial form, as illustrated and embodied in United States letters patent No. 1,095,779. This commercial form, later patented, was first suggested by the engineers of the Buick Motor Car Company (a constituent of the General Motors Company) when Baker first procured an order from that company. The patent application for this form specially stresses the play allowed to permit further expansion after the parts were assembled and in position, and that Baker fully realized the practicability and almost equal efficiency of a split rim without the plate is evidenced by United States letters patent solicited by him, No. 1,244,685, issued October 30, 1917, on application filed March 25, 1916, and No. 1,244,014, issued October 23, 1917, on application filed April 3, 1916. In both patents it is said that:

"As tires and rims are now proportioned, little, if any, circumferential separation is possible while the rim is in position on inextensible beads or flanges of a straight-side or Q. D. pneumatic tire."

These considerations lead to the conclusion that the difference, if any, in the principle of operation between Bouquillon and Baker, was incidental and not substantial. Bouquillon, as said, did not disclose in his drawings or describe in his specifications any form of connecting plate across the split. He referred the public to any and all suitable means for that purpose known in the art. Any one, including Baker, had he looked to the art to which he was thus referred, could and would have found a number of connecting plates, not only suitable, but which had been used for that purpose. British patent to Sylvester, No. 2,793 of 1907, discloses the identical form of connecting plate used by Baker, including the studs thereon, called for by claims 2 and 6. Connecting plates equally suitable are disclosed by French patent to Liais, addition No. 8,428 to patent No. 382,136; British patent to Lipowsky, No. 23,496 of 1899; British patent to Turquand, No. 7,929 of 1908; in fact British patent No. 18,415 of 1893 to Brooks, in the bicycle art, contains a complete disclosure of a suitable connecting plate without studs.

Rougier discloses a combination in substance the same as Baker, although mechanically different in many respects. He discloses the Michelin, instead of the Vinet or continental, method of mounting. He discloses three types of split rim, of which that illustrated in Fig. 2 is the closest approach to Baker. It is integrally flanged, and split, not in one, but two, places, with the ends at one split permanently hinged together, and with only two free ends. He also discloses means for positively, but detachably, connecting together these two free ends across the split, and studs, called lugs, on these connecting means to perform the function of driving connections between the tire-carrying

rim and the wheel felly. In principle of operation, no real difference, is perceived between Rougier and claims 1 and 9, although the specific form of construction is substantially different.

The foregoing contains by no means a full review of all the pertinent art; but, since that reviewed is admittedly the most pertinent, an examination of the rest can be dispensed with. Upon full consideration, my conclusion is that claims 1 and 9 are completely anticipated by Bouquillon and substantially anticipated by Rougier, if they are to be given the broad construction for which plaintiff contends.

[2] Due consideration has been given plaintiff's argument that an anticipating structure must embody all the elements and features of a later invention in order to be an anticipation, and that foreign publications are to be scrutinized more closely, and will be held to a more exact degree of clearness of disclosure, than domestic publications. The authorities cited deal with disclosures by publication and not by foreign patents. In any event, the patent law as stated in the cases referred to by counsel is accepted as the test by which the anticipating patents in this case have been judged. That rule requires that anticipating patents shall exhibit by their descriptions or drawings such a substantial representation of the patented invention, and shall exhibit it in such full, clear, and exact forms, as will enable any person, skilled in the art to which it belongs, to practice the invention without the necessity of making experiments. This rule, however, does not exclude the right to make obvious mechanical changes or such perfecting and refining in the anticipating structure as is usual and permissible in adapting the invention to commercial and practical use.

In Sparks-Withington Co. v. Jay (6 C. C. A.) 270 Fed. 449 (decided below by me), the Court of Appeals of this circuit had under consideration the Jay invention of a vacuum feed system. In its broader claims it was held anticipated by the Tice device, disclosed in an engineering publication which concededly was not commercially practicable; but Judge Knappen, delivering the opinion, says:

"We think the Tice device, as disclosed by him, cannot be pronounced inoperative in a patentable sense, although under many conditions likely to be met it would fail to function, and thus could not be successful commercially. But, testing the disclosure as we think we should by the rules applicable to a patent, the device, as described, did not lack invention merely because the inventor did not successfully bring his art to the highest degree of perfection, nor because, without changes in or additions thereto, it could not be successful commercially."

In Republic Iron & Steel Co. v. Youngstown Sheet & Tube Co. (6 C. C. A.) 272 Fed. 386 (decided below by me), the same principles were announced, and, although the skelp-charging furnace device of the prior patent had never been installed or used commercially, it was held to anticipate a later patent for a skelp-charging device which had been, not only installed, but had become successful commercially; and this was held, even though the later device was found not to infringe the prior patent, because of the narrow limitations imposed by the claims of the prior patent.

As to Bouquillon, no mechanical changes were necessary to make it, in my opinion, the exact counterpart of Baker's claims 1 and 9, unless

it should be the obvious mechanical change in the form of the integrally flanged rim. It might be necessary, also, to add driving connections to the connecting plate; but these mechanical changes are pertinent only in considering claims 2 and 6.

If I am wrong in my conclusion respecting anticipation, certainly no invention is present in claims 1 and 9 over the prior art. Whether invention is present or not is, it has been said, a question of fact, and, in determining it, all the prior ·art, including prior uses and general trade practices, must be taken into consideration. I deem it unnecessary to repeat or bring together that art in this connection, since I have already dealt with it at sufficient length, and upon due consideration it is found that no invention is present, and that claims 1 and 9 must be held to have been improvidently granted, and therefore null and void.

This conclusion has not been reached without giving full consideration to the commercial success claimed for Baker's invention and the alleged displacement thereby of existing types of demountable rims. These considerations are always urged in support of a patent, the device of which has gone into use or has been marketed and sold. In the several hundred patent cases which I have heard, this consideration has been urged in nearly all of them, but in two instances only has the commercial success and the corresponding displacement of existing devices been of such a nature as to be impressive. One was the Tufford patent for the concavo-convex form of rubber heel lift. See Fetzer & Spies v. I. T. S. Rubber Co. (6 C. C. A.) 260 Fed. 939, 171 C. C. A. 581. This success, however, did not eventually save the patent from a comparatively narrow construction of its claims. See Tee Pee Rubber Co. v. I. T. S. Rubber Co. (6 C. C. A.) 268 Fed. 250. The other was the Jay patent for the vacuum feed system for automobiles, in which a showing was made that in less than three years it had gone into use on 83 per cent. of the cars made and sold, displacing the pre-existing pressure and gravity feed system. But this commercial success did not preclude a holding that this patent was in all its broad claims anticipated and could be sustained only for the narrow, specific · construction embodied in claims 9 and 14. See Sparks-Withington Co. v. Jay (6 C. C. A.) 270 Fed. 449; Jay v. Weinberg (7 C. C. A.) 262 Fed. 973; Jay v. Sparks-Withington Co. (D. C.) 258 Fed. 45.

In cases when the question of invention is left in doubt after applying the usual tests, commercial success is regarded, and properly, as entitled to great or little weight, depending upon the circumstances. It may generally be taken as evidence of utility and of practicability; but when the further claim is made that this success is due to the invention itself, or that the invention has displaced the existing devices, the inquiry enters into a field where so many factors are involved that a definite inference is usually hard to draw. The occasion may be new, and hence the device is a response to a new need, and not a solution of a problem which has been long unsuccessfully sought. The prompt acceptance may, as in the Jay vacuum feed system, be the result of its timely appearance in the evolution of an industry. It may be the result of the concurrence of many contributing causes, to which the inventive conception of the successful device may have contributed very

little. In my experience, no other considerations in support of a patent have been so uniformly and confidently advanced, and I have found none which has called for closer discrimination in order to avoid being deceived and misled.

Now, what are the facts in this case? No devices embodying the precise disclosure of the patent in suit were ever made, otherwise than experimentally. Once Baker presented his device to the skilled engineers and mechanics of the Buick Motor Car Company, they perceived the necessity for redesigning it, and this was done, as Baker testifies, by him, working in co-operation with them. It was this reconstructed device that is disclosed and embodied in patent No. 1,095,779. How many in this form were sold is not shown, and that the device would ever have gone into use without being thus redesigned and reconstructed is and must always remain a matter of conjecture. In this case, Mr. Sessions has compiled from the records of the Tire Rim Association statistics showing tires made during various years in which a split rim was an element, and the court is asked to draw the inference that the invention of the patent in suit produced these sales. This inference is of more than doubtful validity. In a suit by the present plaintiff against the Kelsey Wheel Company, similar statistics were prepared, and similar testimony presented, from which a like inference was asked to be drawn in favor of the patents involved in that suit. Those patents were United States letters patent No. 1,095,953, issued to E. K. Baker, and No. 1,095,771, issued to J. A. Anglada, assignor of plaintiff, and it was stated on this hearing by counsel, without dispute, that Anglada was held valid and infringed, and that Baker was held invalid by Judge Tuttle.

It is also said that the present plaintiff in 1914 sued in this court the Standard Welding Company for infringement of the patent in suit, and that during the hearing, and before decision, the defendant made a settlement of the case and accepted a license from the plaintiff. An examination of the record of that case discloses that the suit did charge infringement of patent No. 1,095,775, the patent in suit; but it also charged infringement of United States letters patent No. 1,095,770, issued October 28, 1910, to Joseph A. Anglada, and of No. 1,095,953, issued May 5, 1914, to E. K. Baker. Hence it does not follow that, if the suit had been based on the patent now in issue, the defendant would have made a settlement and have accepted a license. Nor does it appear how many patents were included in the license which the plaintiff granted and the defendant accepted as a result of that settlement; but it does appear that Hawley and Baker were prolific solicitors of patents, and that plaintiff's business is and always has been the exploitation of patents, chiefly by means of licenses. Defendants' Exhibit 35, already referred to, issued January 17, 1917, shows a prodigious number of patents owned by plaintiff upon tire rims, and 58 separate combinations of demountable rim constructions to which they were applicable.

That the old split rim has, as a consequence of the development of the pneumatic tire with abrupt shoulders and nonextensible beads, become a popular element of rim constructions, is undoubtedly true.

Its wide use is on the medium and low priced cars, of which such prodigious numbers have been made and sold since 1910; but that the combination embodied in the patent in suit has produced this result is not proved and cannot be admitted. Baker is not entitled to claim that, because he used in his combination the old split rim of the industry, all rims or rim constructions embodying the old split rim are the result of his inventive genius. He is not entitled to claim that the mere inclusion of the split rim in a combination is the producing cause of the production and sale of demountable automobile rims in which that old element appears, and thereby make an infringer of every manufacturer or user of an automobile in which the demountable rim has a transverse split. On the contrary, as evidenced by the patents upon which plaintiff relied in its actions against the Kelsey Wheel Company and the Standard Welding Company, it is the specific form of combination into which the transversely split rim has entered which constitutes the invention and accounts for the wide use and sale. It is the specific device for contracting and expanding the split rim and securing and holding it safely in place in its expanded form which has popularized the transversely split rim, and not merely the connecting plate positively but detachably connecting the rim ends. In, point of fact, nearly every manufacturer has produced and developed his own type of split demountable rim. The defendant in this case began to make its type as early as 1913, and there is nothing to indicate that it then had any knowledge of the existence of Baker's alleged invention; on the contrary, as will be shown, Baker probably did not obtain his first order from the Buick Motor Car Company earlier than 1913.

[3] Plaintiff also challenges the priority in the art which I have accorded Bouquillon, and perhaps Rougier. It has introduced evidence which it is claimed carries Baker's invention date back beyond Bouquillon's patent date, and asserts that this evidence is sufficient for that purpose under the well-established rules as to the weight and cogency of such evidence. The established rules for weighing evidence introduced for this purpose, applied to an issue of this magnitude, are sufficiently stated in the following cases: Barbed Wire Patent Case, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Columbus Chain Co. v. Standard Chain Co. (6 C. C. A.) 148 Fed. 622, 629, 78 C. C. A. 394; Vandenburgh v. Truscon Steel Co. (6 C. C. A.) 277 Fed. 345, 346 (decided below by me). In my opinion, all the reasons stated in these cases as to why such evidence should be of a certain standard, and why it should be viewed with the greatest scrutiny because of its inherent weakness and dangerous tendency, apply to the situation now before the court. Here the evidence is wholly oral. The recollections of the several witnesses are not supported by a single physical fact, written memorandum, or document. All that any of them testified to might still be true in fact, and yet an error in fixing the date would render it irrelevant. Many important steps in the development of the invention are not covered at all by the testimony, and are of such a nature that testimony thereto should be easily available.

These considerations alone would compel one to adopt Baker's application date as the only safe and dependable date for his invention,

but there are other considerations tending strongly against the probability that his invention was made and developed at the time stated. In the first place, both Baker and Hawley were experienced in the patent law. Both had made several inventions and had applied for and obtained patents as of an earlier date. Hawley was a patent attorney, and had solicited these prior patents, as well as the patent in suit. It is highly improbable that persons of their skill and experience, whose business in large part was soliciting and exploiting patents, persons who not only knew the rules of law pertaining to priority of invention, but who were fully equipped to proceed promptly, would have failed to apply for a patent on any and every device as soon as it was sufficiently developed to meet the requirements of the Patent Office.

Again, Baker's testimony is gravely discredited. In this case he testifies that the B. U. D. rim, embodying the inventions of the Hawley and Baker patents of an earlier date, already referred to, was found to be commercially unsuccessful, if not impracticable, as soon as they began to market and sell them, certainly as early as 1909. Yet, while prosecuting the application for the Hawley and Baker patent, No. 915,954, in conformity to the disclosures of which the B. U. D. rim was made and sold, he swore to and had filed in the Patent Office an affidavit, dated September 10, 1913, in which, speaking of these rims, he says they "have manufactured and sold, and caused to be manufactured, to be sold and used on thousands of wheels and rims embodying said invention, and these wheels and rims have been since that time and are now being successfully used and operated in many states and cities throughout the United States." This affidavit was used, apparently with success, in an interference proceeding with a codepending application of Edwin Copeland Shaw. The same statement was repeated in another affidavit dated January 20, 1913. No adequate, if indeed any, explanation of this grievous conflict in this testimony is offered or suggested. Moreover, when first examined in this hearing as to when his first order was obtained from the Buick Motor Car Company for rims embodying the patented device, his answer then given creates the palpable impression that he referred it to the year 1913. Later during the trial, and when recalled, he gives the year as 1911, but leaves the matter in doubt, being only willing to say, "I think it was 1911." Furthermore, the advertisements of the plaintiff, introduced in evidence, show that during the entire year 1911 the only type of demountable rim illustrated or advertised for sale by plaintiff was this B. U. D. type. No reference is found in any of these advertisements to the type of the patent in suit. No corroboration from the Buick Motor Car Company is offered with respect to this important fact, and no explanation is given of the failure to produce it. It was in 1913 that plaintiff learned that defendants were manufacturing and selling the construction which it is now alleged is infringed, and this suit was not brought until 1922, and no good or sufficient reason is disclosed for not having prosecuted defendant earlier for the alleged infringement.

In view of these circumstances, plaintiff cannot be said to have sustained the heavy burden required to show invention earlier than the

application date; indeed, it cannot be said to have sustained the burden of showing that the commercial form of the patented invention was marketed prior to 1913. In this situation the warning found in the prolonged litigation over the Perlman detachable demountable rim should be heeded. In his first suit against the Standard Welding Company, priority over Vinet was allowed, and the Standard Welding Company made a settlement involving, it is said, $1,000,000. That evidence of priority, as summarized by Judge Hunt, seems convincing beyond a reasonable doubt, and in comparison with it plaintiff's evidence in this case is relatively insignificant. See Perlman v. Standard Welding Co. (D. C.) 231 Fed. 453, affirmed 231 Fed. 734, 146 C. C. A. 18. Yet it is a matter of common notoriety that, in a later case against the Firestone Company, the fraudulent, if not the perjured, character of this evidence tending to show priority was so clearly demonstrated that Perlman's counsel withdrew from the case and submitted voluntarily to a decree dismissing the bill.

[4] The combination embodied in claims 2 and 6 remains to be considered. Claim 2 is as follows:

"A one-piece integrally flanged demountable rim of the bolted-on class described, and transversely split at one point in its circumference, in combination with a one-piece combined driver and rim connector extending across said split and positively, but detachably, connecting the ends of the rim for the purposes specified."

Claim 6 is the same, except that it omits the words "a one-piece" and the words "extending across said split." The drawings and specifications illustrate and describe a one-piece plate with an aperture in the center registering with a similar aperture in the rim and felly to accommodate the valve stem, and two lugs projecting downwardly and inwardly from the ends of said plate, one on each side of the split and adapted to enter and register with holes in the felly. This specific form of construction is aptly described and combined with the other elements of the patented invention already set forth in discussing claims 1 and 9. In the commercial form first adopted by the Buick Motor Car Company, and later embodied in Baker patent No. 1,095,779, the plate is applied on the inner side of the rim, between it and the felly, instead of on the outer side, between it and tire beads. The lugs are increased to four, two on each side of the transverse split, and are formed on the rim ends, instead of on the plate ends. With these variations and the play or lost motion provided in the commercial form to accommodate and limit circumferential expansion of the rim under the pressure of the wedge lugs, the construction of both patents is the same. The later or commercial type of the second patent will be assumed to be merely permissible refining and perfecting of the original invention to adapt it for practical and commercial use.

[5] The validity of claims 2 and 6, in view of the prior art and the considerations already set forth in discussing claims 1 and 9, turns on whether or not this limited and specific form and organization of features and elements embodies invention of that kind known as a limited and specific invention. The invention is not primary or generic. It cannot be given any wide range of equivalents. The arguments mak-

ing against invention, and supporting the assertion that the combination of lugs with the connecting plate forming a one-piece driving connection, taken with all the other old elements brought together into the combination, is only an aggregation and not invention, are weighty and substantial. I do not, however, deem it necessary to express an opinion on this question. If claims 2 and 6 can escape condemnation for want of invention, it is in consequence only of the rule relating to specific invention of constructions aptly stated in the following cases; Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053; Adams Elec. R. Co. v. Lindell R. Co., 77 Fed. 432, 23 C. C. A. 223; Jay v. Weinberg (D. C.) 250 Fed. 469, affirmed (7 C. C. A.) 262 Fed. 973; Jay v. Sparks-Withington Co. (D. C.) 258 Fed. 45, affirmed (6 C. C. A.) 270 Fed. 449. The rule is this:

"If the advance towards the thing desired is gradual and proceeds step by step so that no one can claim the complete whole, then each is entitled to the specific form of the device which he produces, and every other inventor is entitled to his own specific form, so long as it differs from those of his competitors and does not include theirs."

Applying this rule, and giving to plaintiff its specific form of device, it must be held that defendant is entitled to its specific form of device and that infringement is not shown. The connecting plate of defendants' transversely split rim is a flat plate on the inner side of the rim, riveted to one end of the rim with a lug or lip on the other end adapted to enter a slot in the rim. When the rim ends are brought in apposition and the lip of the plate engages the slot, it is rigidly locked in this position by a swiveled button, with a short lever or arm attached to move it. Upon one end of the plate is formed a knob or boss adapted to engage a corresponding hole in the rim felly. Neither the plate, rim, nor felly band is perforated, as is plaintiff's construction, to accommodate the valve stem, but the valve stem aperture is placed in another part of the rim. Treating plaintiff's device as specific, and conceding, for the purposes only of this case, that invention is present therein, it must still be held that defendants have independently developed their specific form of construction, and that this construction differs sufficiently from plaintiff's to avoid a charge of infringement.

To sum up my conclusions, claims 1 and 9 of the patent in suit are invalid because anticipated, and, even if not anticipated, are invalid for want of invention. No opinion is expressed as to the validity of claims 2 and 6; but, even if valid, they must be limited to the specific form described and claimed. Defendants' construction does not infringe claims 2 and 6 as thus limited.

A decree will be entered in conformity herewith, dismissing plaintiff's bill, at its cost.